S10A0737, S10X0738. THE STATE v. THOMPSON;
and vice versa.
(702 SE2d 198)

THOMPSON, Justice.

Torrey Thompson, a police officer, was indicted for the murder of Lorenzo Matthews. Thompson moved to suppress statements he made in the course of an internal police investigation. See generally *Garrity v. New Jersey*, 385 U. S. 493 (87 SC 616, 17 LE2d 562) (1967) (the protection against coerced confessions under the Fourteenth Amendment prohibits the use in subsequent criminal proceedings of confessions obtained from public officers under a threat of removal from office). He also sought immunity from prosecution under OCGA § 16-3-24.2. The trial court granted Thompson's motion to

suppress but denied his motion for immunity. The State appeals from the grant of Thompson's motion to suppress; Thompson cross-appeals from the denial of his motion for immunity. We find no error and affirm.

At approximately 3:15 a.m. on September 12, 2006, the DeKalb County Police Department (DKPD) received a 911 call reporting a stolen motor vehicle from an apartment complex. Officer R. L. Knock, Sergeant Berg, and Officer Torrey Thompson, among others, were called to the scene. Police interviewed the complainant, Earl McCord, who stated that his car, a Monte Carlo, had been stolen from outside his apartment. Police then interviewed Ms. Mullins, another resident of the apartment complex, who told police that the car had not been stolen, but had been involved in a hit-and-run car accident (involving the Monte Carlo and her car), and that the drivers and passengers of the Monte Carlo were friends and relatives of McCord. Ms. Mullins directed police to apartments 38 and 40, and told them Lorenzo Matthews, who was involved in the hit-and-run incident, lived there.

Officer Nunn, another policeman on the scene, recognized Matthews' name and alerted his colleagues to the fact that Matthews was wanted for questioning regarding a shooting incident in a nearby apartment complex, as well as for assaulting a police officer. Mullins added that Matthews was known to be armed.

Under the supervision of Sgt. Berg, the police decided to interview Matthews. Sgt. Berg and two other officers went to the front door of apartment 38. He ordered Thompson and Knock to cover the back of the apartment building in case Matthews attempted to escape. Berg knocked at apartment 38 but was told Matthews was not there. Thompson and Knock noticed someone looking through the blinds of a window in apartment 40. When Berg went to knock at apartment 40, the rear door of the apartment swung open, and Matthews came out onto the porch. He pointed at Thompson with an object in his hand. Witnesses claimed the object was a cell phone. To both Thompson and Knock, the object looked like a weapon. However, in spite of an extensive search, a weapon was not found at the scene.

Knock ordered Matthews to stop and drop the object. Matthews began running down the staircase and jumped toward Knock, who fired at Matthews four times. Matthews then ran toward Thompson, still holding the object in his hand. Knock shouted, "Shoot him!" and, after hesitating briefly, Thompson fired two rounds at Matthews.

Matthews then ran away from Thompson toward a wooded area adjacent to the apartment complex; Thompson pursued on foot. Recognizing that the woods would afford Matthews a tactical offen-

sive advantage, Thompson intermittently fired at Matthews as he ran. Thompson testified that he was fearful both for his life and for the lives of the residents of the apartment complex. When Matthews entered the wooded area, Thompson fired once more before Matthews jumped over a fence. At that point, Thompson ceased pursuit and called for backup. Matthews' body was found later by a K9 unit on the other side of the fence. He had sustained eight gunshot wounds, two of which were found to be fatal.

After the incident, Sgt. Berg ordered Thompson and Knock to separate themselves and wait in their respective patrol cars on the scene until Internal Affairs and CID Major Felony unit could take their statements, pursuant to DKPD "Use of Force" policy. As he was waiting, Thompson exited his patrol car to avoid being filmed by a television news team. Another officer stopped him and informed him he was not free to leave.

Thompson gave a statement to Detective Calamease from the Major Felony unit. He also participated in two "walk-throughs" with Sgt. Love from Internal Affairs. Neither Calamease nor Love told Thompson he was required to participate in the internal investigation; but they did not tell Thompson he was free to refuse to participate, either. Thompson cooperated with each investigation but testified at the hearing on the motion to suppress that he felt compelled to do so for fear of losing his job. He also testified that he was aware of the DKPD Employee Manual which states that the failure to answer questions in an "internal department investigation" is prohibited and concludes by stating that an officer who fails to abide by department rules can be disciplined by being terminated from employment.

### The Main Appeal

The trial court looked at the totality of the circumstances and found that Thompson subjectively believed he would lose his job if he did not cooperate with Calamease and Love. It also found that Thompson's subjective belief was objectively reasonable.

In *State v. Aiken*, 282 Ga. 132 (646 SE2d 222) (2007), this Court adopted the "totality of the circumstances test" for evaluating whether a public employee's statement to investigators was voluntary or coerced:

> Factors that a court may consider [in evaluating whether an employee's statement to investigators was coerced] include . . . whether the State actor made an overt threat to the defendant of the loss of his job if he did not speak with investigators or whether a statute, rule, or ordinance of

which the defendant was aware provided that the defendant would lose his job for failing to answer questions. If no express threat is present, the court may examine whether the defendant subjectively believed that he could lose his job for failing to cooperate and whether, if so, that belief was reasonable given the State action involved. In determining whether the defendant's belief was objectively reasonable, the court may examine whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate. The court may also consider whether the investigator implicitly communicated any threat of dismissal either in written or oral form; whether, before the interrogation began, the defendant was told he was free to leave at any time; and whether the defendant was told he had the right to have a lawyer present. A trial court, of course, is free to consider any other factor that it determines is relevant to the determination of voluntariness.

Id. at 135-136. Giving due deference to the trial court's findings, we find no abuse of discretion. See id., n. 21 ("In reviewing a trial court's determination regarding whether a statement is voluntary, we defer to the trial court's findings of fact unless clearly erroneous, but we review de novo the trial court's application of the law to undisputed facts.")

Pointing to Thompson's testimony that he wanted to tell Calamease what happened and that Calamease considered Thompson to be a witness, not a suspect, the State argues that Thompson's statements to Calamease were wholly voluntary. This argument misses the mark. In the absence of a direct threat to Thompson for failing to cooperate, the trial court properly focused on Thompson's subjective belief that he could lose his job, and whether that belief was objectively reasonable. The trial court answered these questions affirmatively. That Thompson testified he wanted to tell Calamease what happened does not undercut his subjective belief that he would be punished if he did not cooperate. After all, Thompson would have been anxious to tell what happened because he believed that the shooting was justified. Still, he would not have spoken to Calamease but for his fear of being punished. Compare *State v. Stinson*, 244 Ga. App. 622 (536 SE2d 293) (2000) (subjective belief requirement was not met because defendant police officer did not testify).

We reject the State's assertion that, because the employee manual's prohibition against refusing to cooperate only applies to investigations conducted by Internal Affairs, Thompson's subjective

belief that he would be punished if he did not speak to Calamease (of the Major Felony unit) could not be deemed to be objectively reasonable. Given the totality of the circumstances, including evidence that the Internal Affairs and Major Felony investigations were proceeding simultaneously, that Thompson was instructed that he was not permitted to leave the scene, and that Thompson's statements to Calamease were included in the Internal Affairs report, we cannot say that the trial court abused its discretion in making that determination.

### The Cross-Appeal

To avoid trial under OCGA § 16-3-24.2, a defendant must show that he is entitled to immunity by a preponderance of the evidence. *State v. Bunn*, 288 Ga. 20 (701 SE2d 138) (2010); *Bunn v. State*, 284 Ga. 410, 413 (667 SE2d 605) (2008). We agree with the trial court that Thompson did not carry his burden of showing he was justified in using deadly force. *State v. Bunn*, supra.

*Judgments affirmed. Hunstein, C. J., Carley, P. J., Benham, Hines and Melton, JJ., and Judge James G. Bodiford, concur. Nahmias, J., is disqualified.*

### DECIDED NOVEMBER 8, 2010.

*Gwendolyn Keyes Fleming, District Attorney, Leonora Grant, Assistant District Attorney, Thurbert E. Baker, Attorney General*, for appellant.

*Atkins & Attwood, William J. Atkins, David B. Fife*, for appellee.