**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 18, 2013**

# In the Court of Appeals of Georgia

A13A0889. LENGSFELD v. THE STATE.

MILLER, Judge.

Following a jury trial, Todd Lengsfeld was convicted of four counts of child molestation (OCGA § 16-6-4 (a) (1)), four counts of enticing a child for indecent purposes (OCGA § 16-6-5 (a)), and five counts of violation of oath by public officer (OCGA § 16-10-1). Lengsfeld appeals from the denial of his motion for new trial, contending that the trial court erred in admitting into evidence statements he made to a Georgia Bureau of Investigation ("GBI") agent because (1) the statements were protected under *Garrity v. New Jersey*, 385 U.S. 493 (87 SCt 616, 17 LE2d 562) (1967), and its progeny and (2) he was not advised of his *Miranda* rights. Lengsfeld also contends that (3) his sentences for enticing a child merged into his convictions and sentences for child molestation, and that (4) his trial counsel was deficient for

withdrawing a request to charge on the lesser included offense of sexual battery. For the following reasons, we affirm Lengsfeld's convictions.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that Lengsfeld met the victim[2] through martial arts classes where he was an instructor. Lengsfeld asked for the victim's cell phone number and began communicating with her outside of class.

On the night of May 10-11, 2009, Lengsfeld asked the victim to sneak out of her house to meet him. After sneaking out of the house, the victim called Lengsfeld, who picked her up in his unmarked patrol car and drove to a nearby church parking lot. There, he kissed the victim, removed her shirt and rubbed her breasts and thighs. After approximately an hour, Lengsfeld returned the victim to her home.

On the night of May 15-16, 2009, Lengsfeld again asked the victim to sneak out of her house to meet him. He picked her up and took her to the same church parking lot where he kissed the victim and touched her breast and thighs while she

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[2] The victim was born October 23, 1993 and was 15 years old in the spring of 2009.

was wearing nothing but her underwear. Lengsfeld then removed his shirt, took out his penis and expressed a desire to have sex with the victim.

One night in early June 2009, the victim was staying at her cousin's house. Lengsfeld asked the victim to sneak out of the house, picked her up in his unmarked patrol car, and drove her to his house. At his house, Lengsfeld removed all of the victim's clothing and kissed her on the buttocks, stomach, inner thighs, and vagina. Lengsfeld had his penis out and was rubbing it between the victim's thighs and was brushing it against her vagina. He stopped at the victim's request.

On June 15, 2009, the victim informed Lengsfeld that she was going to see a movie with her family. Lengsfeld went to the theater and sat with the victim. Following the film, the victim's mother inquired about Lengsfeld's presence at the theater and searched the victim's text messages. When she found out that Lengsfeld and the victim had been exchanging text messages, she told the victim not to have any more contact with Lengsfeld. She also spoke with Lengsfeld, reminded him that the victim was only 15 years old and told him to stay away from the victim.

Later that month, the victim's father contacted the owner of the jiu jitsu academy to express his concerns about Lengsfeld. He forwarded the text messages

from the victim's phone to the academy owner. The text messages were subsequently extracted from the academy owner's phone.

Nevertheless, on July 4, 2009, while the victim was at her friend's house, Lengsfeld sent a text message to the victim that he wanted to see her again. Lengsfeld picked the victim up in his patrol car after she snuck out of her friend's house. He then took the victim back to his house where he caressed her body while she sat on his lap, and touched her bare breasts and her inner thighs.

In late July, the Newnan Police Department was made aware of the allegations against Lengsfeld. The deputy chief interviewed the victim, in the presence of her parents. Following an internal and criminal investigation, Lengsfeld was indicted on numerous counts, including multiple counts of child molestation, enticing a child for indecent purposes and violation of oath by public officer.

1. In enumerations one and two, Lengsfeld contends that statements he made to a GBI agent were not voluntarily made, and, therefore, should have been suppressed. We disagree.

(a) Lengsfeld first argues that statements he made during the interview with the GBI Agent on July 29, 2009 were protected under *Garrity*, supra, because he believed

4

that he would be terminated from his job as a police officer if he refused to speak with the GBI agent.

"In reviewing a trial court's determination regarding whether a statement is voluntary, we defer to the trial court's findings of fact unless clearly erroneous, but we review de novo the trial court's application of the law to [the] undisputed facts." *State v. Aiken*, 282 Ga. 132, 136 (2), n.21 (646 SE2d 222) (2007). In *Garrity*, the United States Supreme Court held that statements obtained under the threat of removal from office or government employment cannot be used in a subsequent criminal investigation. *Garrity*, supra, 385 U. S. at 497-498. In applying *Garrity*, Georgia courts have employed a totality-of-the-circumstances test to determine whether statements made by a public employee during an investigation into his activities are voluntary. See *Aiken*, supra, 282 Ga. at 135 (2); *State v. Stanfield*, 290 Ga. App. 62, 63 (2) (658 SE2d 837) (2008).

In applying that test,

> [f]actors that a court may consider include . . . whether the State actor made an overt threat to the defendant of the loss of his job if he did not speak with investigators or whether a statute, rule, or ordinance of which the defendant was aware provided that the defendant would lose his job for failing to answer questions. If no express threat is present, the court may examine whether the defendant subjectively believed that he could lose his job for failing to cooperate and whether, if so, that belief was

reasonable given the State action involved. In determining whether the defendant's belief was objectively reasonable, the court may examine whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate. The court may also consider whether the investigator implicitly communicated any threat of dismissal either in written or oral form; whether, before the interrogation began, the defendant was told he was free to leave at any time; and whether the defendant was told he had the right to have a lawyer present. A trial court, of course, is free to consider any other factor that it determines is relevant to the determination of voluntariness.

(Footnotes omitted.) *Aiken*, supra, 282 Ga.135-136 (2).

So viewed, the record shows that on July 28, 2009, Lengsfeld met with the deputy chief of the Newnan Police Department as part of an internal investigation into the allegations against Lengsfeld. During this conversation, the deputy chief informed Lengsfeld of his *Garrity* rights and that the resulting conversation was protected under *Garrity*. He then asked Lengsfeld to report to the station the following day. The deputy chief also met with the victim and questioned her about her relationship with Lengsfeld. Based on this conversation, the deputy chief developed probable cause regarding the victim's allegations of sexual misconduct and determined that a criminal investigation was needed. Chief D.L. Meadows then

6

prepared a letter informing Lengsfeld that he was being put on administrative leave with pay pending the GBI's completion of a criminal investigation.[3]

On the morning of July 29, 2009, Lengsfeld arrived at the police station to take a polygraph test as part of the internal investigation. Lengsfeld drove his state-issued police car to the station. Upon arrival, Lengsfeld was informed that the internal investigation had concluded and, as a result, he was being placed on administrative leave. Lengsfeld then signed the letter prepared

---

[3] The letter provides:

> During the course of investigating a complaint against you for improper contact with [a] 15 year old female, information was obtained that has led us to ask the Georgia Bureau of Investigation to conduct a criminal investigation.
>
> This will serve [as] notice that you are placed on administrative leave with pay. This leave will continue until the Georgia Bureau of Investigation has completed an investigation into the complaint.
>
> To [e]nsure the integrity of the investigation, you will not contact the 15 year old female, or any witnesses associated with the investigation. You should not go to any City or County work site without the permission of Chief Meadows, or [the deputy chief]. You are required to turn in all city and county property during this leave.
>
> If you have any questions [in] reference [to] this investigation, you will need to contact Chief Meadows or [the deputy chief].
>
> I encourage you to cooperate fully with this investigation so that we may resolve this matter as quickly as possible.

by Chief Meadows, which acknowledged this decision and also informed him that the GBI would be conducting a criminal investigation into the matter.

After signing the letter, Lengsfeld was asked by a GBI agent if he wanted to take the scheduled polygraph test. Lengsfeld declined to take the test, because the deputy chief and the GBI agent told him that it would not be covered under *Garrity* and an attorney he had spoken to the night before had advised him not to take the polygraph under those circumstances. Nevertheless, Lengsfeld agreed to an interview with the GBI agent, even though the agent told Lengsfeld that he was conducting a criminal investigation.

During the interview, Lengsfeld admitted that he had flirted with the victim, spoken with her on the telephone, sent her text messages, driven her to his home around midnight on two occasions, and transported her to various locations in Coweta County late at night. Lengsfeld also admitted that he had been to the victim's house. When the agent asked Lengsfeld what he did at the victim's house, Lengsfeld asked the agent if he needed an attorney. The GBI agent advised Lengsfeld that the interview would end if he felt he needed an attorney, whereupon Lengsfeld concluded the interview and left the room. Lengsfeld then returned to his supervisor's office and turned over his badge, gun, and car.

Lengsfeld subsequently moved to suppress the statements he made to the GBI agent. The trial court conducted an evidentiary hearing to determine whether those statements were made in violation of *Garrity* and *Miranda*. Following the hearing, the trial court denied Lengsfeld's motion to suppress, finding that the evidence clearly showed that Lengsfeld was not in custody for *Miranda* purposes. The trial court also found that Lengsfeld knew his interview with the GBI agent was not protected under *Garrity* because he refused to take the polygraph test after discussing the differences between *Garrity* and non-*Garrity* situations with an attorney. The trial court further found that Lengsfeld's contention that he was compelled to cooperate with the GBI agent was incredible under the circumstances, considering his eleven years on the police force and the fact that he had made approximately 80 or more arrests.

Applying the *Aiken* test, the facts support the trial court's determination that the statements should not be suppressed under *Garrity*. Notably, there was no evidence that the State coerced Lengsfeld to speak with the GBI agent. Lengsfeld contends that Chief Meadows encouraged him to speak to the GBI agent and that this amounted to coercion. Such encouragement, however, does not rise to the level of coercion. Moreover, even assuming *arguendo* that Chief Meadows ordered Lengsfeld to speak to the GBI agent, a direct order to speak to an investigator does not, by itself,

9

show coercion unless that order is coupled with the threat of termination for failing to follow such order. *Aiken*, supra, 282 Ga. at 137 (3). Here, Chief Meadows's letter, while encouraging Lengsfeld to cooperate with the GBI's criminal investigation, made no threat, either implicit or explicit, that Lengsfeld would suffer a consequence for declining to do so. Additionally, the deputy chief testified that he would not have considered any refusal by Lengsfeld to speak with the GBI agent as an act of insubordination.

Since no express threat was made, we look to whether Lengsfeld had a reasonable subjective belief that he would lose his job for failing to cooperate. Lengsfeld suggests that he was punished for failing to cooperate when he was placed on administrative leave following the conclusion of the GBI interview. The record shows, however, that before he agreed to speak with the GBI agent, Lengsfeld had already been made aware that he was going to be placed on administrative leave. Additionally, Lengsfeld was asked whether he would be willing to take a polygraph test given by the GBI agent, and his refusal was honored. Consequently, the chief's decision to place Lengsfeld on administrative leave clearly was not a punishment for his failure to cooperate with the GBI investigation.

Next, Lengsfeld contends that departmental policy required him to cooperate with the GBI agent. This argument is unavailing and is not supported by the evidence. The policy relied upon by Lengsfeld pertinently provides that "*Employees are to cooperate with all internal investigations* by answering questions, responding to lawful orders, presenting materials, and making statements." (Emphasis added.) The departmental policy explicitly states that it is limited to internal investigations,[4] while the interview in this case was conducted as part of a criminal investigation. Lengsfeld's claim that he was unaware that the GBI agent was conducting a criminal investigation, as opposed to an internal investigation, is belied by the record which shows that, before he met with the agent, Lengsfeld acknowledged that the GBI would be conducting a criminal investigation. Moreover, prior to starting the interview, the GBI agent reiterated that the interview was being conducted as part of a criminal investigation. To the extent Lengsfeld claims not to have known the difference between internal and criminal investigations, this assertion strains credulity in light of his eleven years of experience as a police investigator.

Additionally, although Georgia courts have found compulsion of the defendant's statements on the basis of a departmental policy, those cases are

---

[4] Lengsfeld testified that he did not recall even reading the policy.

11

distinguishable from the instant case. First, the policy at issue here differs from the policies in *State v. Thompson*, 288 Ga. 165, 167 (702 SE2d 198) (2010) or *State v. Stanfield*, supra 290 Ga. App. at 64-65 (2), because the policy in this case does not provide that failure to cooperate with an investigation would result in termination. While *Aiken* did not involve a regulation expressly providing that an employee could face dismissal for failing to cooperate with an investigation, the defendant in that case was also presented with a form that provided that he could be fired if he interfered with the investigation in any manner. *Aiken*, supra, 282 Ga. at 137. In this case, Lengsfeld was presented with no such form or letter threatening termination. As a result, the departmental policy in this case could not have reasonably been interpreted as threatening termination for failing to cooperate with a criminal investigation.

Lengsfeld further contends that he was coerced into the interview because he was not free to leave. This claim is also without merit. In contrast with *Thompson*, supra, 288 Ga. at 169, where the defendant was expressly informed that he was not permitted to leave the scene, Lengsfeld was free to leave at any time. At the time of the interview, Lengsfeld was neither handcuffed, physically restrained, nor placed under arrest. Additionally, the GBI interview ended at Lengsfeld's request based upon his desire to consult an attorney. Although Lengsfeld argues that he was without

12

a vehicle and, therefore, was confined, the record shows that his state-issued vehicle had not yet been confiscated when the interview started; his vehicle was not confiscated until after he terminated the interview; and he was informed in advance of the interview that he was required to turn in all government property as part of his administrative leave. Additionally, nothing prevented Lengsfeld from leaving the police department by simply walking out. As a result, there is no evidence that he was prevented from leaving.

Considering all of these circumstances, the trial court correctly ruled that Lengsfeld's statements were not required to be suppressed under *Garrity*.

(b) Lengsfeld also contends that the statements he gave during the GBI interview should have been suppressed because he was not given *Miranda* warnings. Again, we disagree.

*Miranda* warnings are required when a person is interviewed by an investigating officer while in custody. *Phillips v. State*, 285 Ga. 213, 215 (2) (675 SE2d 1) (2009). For purposes of *Miranda*, a person is in custody if he has been formally arrested or restrained to the degree associated with a formal arrest. *Waters v. State*, 306 Ga. App. 114, 116 (1) (701 SE2d 550) (2010). A determination of whether a person was in custody at the time of an interview "involves an examination

13

of the circumstances surrounding the questioning to determine whether a reasonable person would have felt at liberty to terminate the interrogation and leave." (Citation and punctuation omitted.) *Vaughn v. State*, 282 Ga. 99, 102 (4) (646 SE2d 212) (2007). "Where an accused is neither in custody nor so restrained as to equate to a formal arrest, any statements made to an investigating officer are made under noncustodial circumstances and *Miranda* warnings are not required." (Punctuation omitted.) *Bolden v. State*, 278 Ga. 459, 462 (3) (604 SE2d 133) (2004).

As set forth above, the record in this case shows that Lengsfeld voluntarily agreed to meet with the GBI investigator and that he would have suffered no repercussions for refusing to do so. The evidence also shows that Lengsfeld was not handcuffed or physically restrained in any way, and the interview concluded when Lengsfeld requested an attorney. There is no evidence that the GBI agent gave any indication that Lengsfeld was not free to leave. Although Lengsfeld contends that he subjectively believed that he was in custody, his subjective view is not dispositive of the issue. See *State v Folsom*, 285 Ga. 11, 13 (1) (673 SE2d 210) (2009). Rather, we must determine whether, under the totality of the circumstances, a reasonable person in Lengsfeld's position would not have felt restrained to a degree associated with a

14

formal arrest. In this case, we agree with the trial court that Lengsfeld was not in custody when he made his statement. Therefore, *Miranda* warnings were not required.

2. Lengsfeld contends that his sentences for enticing a child for indecent purposes must be vacated because they merged into his convictions and sentences for child molestation. We disagree.

"The doctrine of merger precludes the imposition of multiple punishments when the same conduct establishes the commission of more than one crime. Whether offenses merge is a legal question, which we review de novo." (Citations omitted and punctuation omitted.) *Louisyr v. State*, 307 Ga. App. 724, 730 (2) (706 SE2d 114) (2011).

"Offenses may merge either as a matter of law or as a matter of fact." *McMillian v. State*, 263 Ga. App. 782, 786 (4) (589 SE2d 335) (2003). The offenses of child molestation and enticing a child for indecent purposes are distinct and separate offenses which are not included within each other as a matter of law, since each has an element not necessary to prove the other.[5] See *Leon v. State*, 237 Ga.

_____

[5] A person commits the offense of child molestation when such person does any "immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the

15

App. 99, 107 (5) (513 SE2d 227) (1999); see also OCGA § 16-6-4 (a) (1); OCGA § 16-6-5 (a). Moreover, these offenses may not merge as a matter of fact because they usually occur sequentially, i.e., the enticement offense is completed before the child molestation act occurs. See *Leon*, supra, 237 Ga. App. at 108 (5); see also *Jackson v. State*, 274 Ga. App. 26, 28 (1) (c) (619 SE2d 294) (2005) ("generally enticement is completed before child molestation occurs"); see also *Yates v. State*, 298 Ga. App. 727, 730 (3) (681 SE2d 190) (2009) ("where the crimes charged are based on more than one separate act or transaction, no merger is required even for charges of the same crime").

Here, Lengsfeld was charged with four counts of enticing a child for indecent purposes (Counts 5, 8, 12, and 16) and four counts of child molestation (Counts 2, 6,

---

person[.]" OCGA § 16-6-4 (a) (1). "A person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts." OCGA § 16-6-5 (a). Although Lengsfeld contends that indecent acts are an essential element of both statutes, the State was not required to prove that an indecent act occurred to obtain a conviction on the four counts of enticing a child. See *Morris v. State*, 179 Ga. App. 225 (1) (345 SE2d 686) (1986) ("It is not required that the [alleged] lewd act be accomplished or even attempted, merely that it was intended as motivation for the enticement.") (punctuation omitted.); *Lasseter v. State*, 197 Ga. App. 498, 499 (1) (399 SE2d 85) (1990) ("[A] conviction under O.C.G.A. § 16-6-5 need not be based upon evidence that an act of indecency or child molestation was accomplished or even attempted[.]")

9, and 13) based on his actions on four separate occasions between May and July 2009.[6] As set forth above, the evidence shows that, on each of these evenings, Lengsfeld encouraged the victim to sneak out of her house. Then, he picked her up, drove her to a secluded destination, and proceeded to touch her in a sexual manner. On each of these four occasions, the evidence shows that the charged offenses of enticing a child and child molestation did not merge as a matter of fact because Lengsfeld completed the offense of enticing a child for indecent purposes before he committed the charged acts of child molestation. See *Leon*, supra, 237 Ga. App. at 108 (5) (defendant's convictions did not merge where he solicited victim by telling her to go to his bedroom, before he committed child molestation by fondling victim and causing her to touch his penis). Accordingly, the trial court did not err in failing

---

[6] Count 5 charged Lengsfeld with soliciting, enticing and taking the victim to his house for the purpose of indecent acts on or about June 6, 2009, whereas Count 2 charged Lengsfeld with committing an act of sodomy on June 6 by licking the victim's vagina. Count 8 charged Lengsfeld with soliciting, enticing and taking the victim to a church parking lot on or about May 11, 2009, whereas Count 6 charged him with kissing the victim and rubbing her inner thighs on May 11 with the intent to arose and satisfy his sexual needs. Count 12 charged Lengsfeld with soliciting, enticing and taking the victim to a church parking lot on or about May 16, 2009, whereas Count 9 charged him with kissing the victim and rubbing her inner thighs on May 16. Count 16 charged Lengsfeld with soliciting, enticing and taking the victim to his residence on or about July 5, 2009, whereas Count 13 charged him with satisfying his sexual desires on July 5 by kissing the victim while they lay together partially nude.

17

to merge Lengsfeld's convictions for enticing a child into his convictions for child molestation.

3. Finally, Lengsfeld contends that trial counsel rendered ineffective assistance by withdrawing a request to charge on the lesser offense of sexual battery. We do not agree.

> To establish ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (104 Sct 2052, 80 LE2d 674) (1984), a criminal defendant bears the burden of showing that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different . . . . The trial court's determination with respect to ineffective assistance of counsel will be affirmed unless its findings are clearly erroneous.

(Citations and punctuation omitted.) *Robinson v. State*, 312 Ga. App. 736, 742 (3) (719 SE2d 601) (2011).

> The offense of child molestation requires a showing that a person committed any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person. The offense of sexual battery, in contrast, requires only that a person intentionally make physical contact with the intimate parts of the body, including the buttocks, of another person without the consent of that person. Sexual

18

battery may be a lesser included offense of child molestation, but there is no error in failing to give the charge if the state's evidence establishes all the elements of an offense, and there is no evidence raising the lesser offense.

(Punctuation and footnote omitted.) *Hilliard v. State*, 298 Ga. App. 473, 475 (2) (680 SE2d 541) (2009). Here, the evidence showed that in each instance which formed the basis of the four child molestation charges against him, Lengsfeld touched or kissed the victim on the breasts, thighs, buttocks and/or vagina, while she was nude or partially nude. On two occasions, Lengsfeld exposed himself to the victim and on one occasion he expressed a desire to have sex with her. In each instance, the evidence established all of the elements of child molestation. See *Gibbs v. State*, 256 Ga. App. 559, 559-560 (568 SE2d 850) (2002) (evidence that defendant touched victim's breasts and vaginal area sufficient to support conviction for child molestation); *Inman v. State*, 295 Ga. App. 461, 465 (2) (671 SE2d 921) (2009) (evidence that defendant exposed himself to victim, fondled her chest and vaginal area and attempted to have intercourse with her supported his child molestation conviction).

Since the evidence established all of the elements of child molestation, the trial court would have been authorized to refuse to charge on sexual battery, even if trial counsel had requested that charge. See *Goss v. State*, 305 Ga. App. 497, 501 (2) (c)

19

(699 SE2d 819) (2010). Moreover, even if the charge had been requested by trial counsel and given by the trial court, given the trial evidence, it is highly unlikely that the jury would have concluded that Lengsfeld inappropriately touched the victim without doing so for sexual gratification, and therefore, it is highly probable that the failure to give this charge did not contribute to the verdict. See id. Accordingly, Lengsfeld cannot show that trial counsel was ineffective for failing to request a charge on sexual battery.

*Judgment affirmed. Barnes, P. J., and Ray, J., concur.*